Joseph M. Vanek (*pro hac vice granted*)
jvanek@sperling-law.com
Bruce Sperling (*pro hac vice granted*)
bss@sperling-law.com
Eamon Kelly (*pro hac vice granted*)
ekelly@sperling-law.com
Trevor K. Sheets (*pro hac vice granted*)
tscheetz@sperling-law.com
Timothy Sperling (*pro hac vice granted*)
tsperling@sperling-law.com
**SPERLING & SLATER**
55 West Monroe Street
Suite 3200
Chicago, IL 60603
(312) 641-3200

Bonny E. Sweeney (Cal. Bar No. 176174)
bsweeney@hausfeld.com
Michael P. Lehmann (Cal. Bar No. 77152)
mlehmann@hausfeld.com
Bruce J. Wecker (Cal. Bar No. 78530)
bwecker@hausfeld.com
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
(415) 633-1908

*Attorneys for Plaintiffs and the Proposed Class*

*Additional counsel on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Left Field Holdings, a Florida limited liability company, Left Field Holdings II, a Florida limited liability company, Left Field Holdings III, a Florida limited liability company, Left Field Holdings IV, a Florida limited liability company, Left Field Holdings V, a Florida limited liability company, Left Field Holdings VI, a Florida limited liability company, and Everfresh Endeavors, a Florida limited liability company, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, a Delaware limited liability company. <br><br> Defendant. | **Case No.** 3:22-cv-01462 <br><br> CLASS ACTION COMPLAINT <br><br> AMENDED COMPLAINT FOR VIOLATION OF THE LANHAM ACT <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Left Field Holdings LLC, Left Field Holdings II LLC, Left Field Holdings III LLC, Left Field Holdings IV LLC, Left Field Holdings V LLC, Left Field Holdings VI LLC, and Everfresh Endeavors LLC (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this amended complaint against Google LLC and allege as follows:

## I.   NATURE OF ACTION

1.   Common law, and more recently federal law under the Lanham Act, have long recognized that businesses have a proprietary interest in their tradenames, reputations, and goodwill; and further, that businesses may not misrepresent the nature and characteristics of their businesses in commercial advertising. If it were any other way, businesses would have little incentive to build a brand name because unscrupulous second-comers could immediately steal, copy, and exploit for themselves, the good name and reputation of first-movers. This case is about Google's disregard of these long-standing principles, and its attempt to trade-off of the goodwill, reputations, and tradenames of thousands of restaurants throughout the United States for its benefit and the restaurants' detriment.

2.   Consumers rarely remember a restaurant's website, phone number, or address. So, when they want to place an order with a restaurant, they usually turn to Google—the world's leading search engine.

3.   Prior to 2019, when Google received a user's search for a restaurant, Google responded with a "search engine results page" that displayed three categories of information. These categories included: (i) information particular to the restaurant the consumer was then searching for, including the restaurant's website, phone number, and address—which Google displayed on the right-hand side of the screen; (ii) a list of "natural" search results, generated from Google's proprietary "search algorithm"—displayed on the left-hand side of the screen; and (iii) 2-3 paid advertisements of companies wishing to promote their own websites, brands, and service offerings—which Google displayed as "Ads" just above the "natural" search results.

4.   For much of the last decade, Google conducted itself in this usual fashion without incident; but in 2019, Google dramatically shifted its tactics, giving rise to this complaint.

5.   Specifically, in 2019, Google modified its search engine results page to contain a large button, or link, to a "food ordering" platform that Google recently designed, developed, and released

into the world. Within the platform, Google created two interrelated environments. The first was a website designed to capture an actual order for the restaurant's food items that the consumer was then looking for. Following receipt of an order, Google's platform passed the order onto third party food-delivery company (herein, "Delivery Provider"), like Postmates Inc., for fulfillment. In another scenario (when Google did not have a relationship with a Delivery Provider willing to accept orders from its platform, Google directed the user into yet another webpage it owned and controlled. Within this second page, Google presented the user with links to third party Delivery Providers' websites and apps. The end result of both webpages, is that Google and its partner Delivery Providers capture the consumer and order, while the restaurant gets stuck paying fees that would have been avoided had the consumer ordered directly from the restaurant.

6.      But Google's newly conceived platform was not, and is not, lawful. First, Google never bothered to obtain permission from the restaurants to sell their products online, and the Delivery Providers to whom Google passed orders were not (and are not) permitted, by contract, to license Google's conduct. Second, Google purposefully designed its websites to appear to the user to be offered, sponsored, and approved by the restaurant, when they are not—a tactic, no doubt, employed by Google to increase orders and clicks within its platform. Third, Google lures consumers into its websites (to the exclusion of the restaurant's actual website and phone number) through a classically deceptive practice, known as a "bait-and-switch." Specifically, Google added a large "Order Online" button just below the tradename of the restaurant on its search engine results page so that consumers searching for the restaurant form the mistaken belief that the button will direct them to the restaurant, when that is not what the button delivers. Rather, it leads the consumer to Google's new, unauthorized, and deceptively branded webpages.

7.      At issue in the case is precisely this sort of deceptive and unfair conduct. In one scenario, Google's "Order Online" button leads to an unauthorized online storefront—one owned and controlled by Google—wherein consumers can place orders for the restaurant's products, all under the restaurant's tradename. Google prominently features the restaurant's tradename at the top of the page, above the restaurant's address and menu, to give the user the distinct impression that the storefront, products, and services are authorized and sponsored by the restaurant, when they are not. And while it would be easy

2

for Google to label its service as "Google's unauthorized buying service," Google does not dare do so. It knows that its website is more likely to generate orders when cloaked in the imprimatur of the restaurant.

8.     Upon capturing an order from its illicit storefront, Google routes the order, unbeknownst to the restaurant, to a Delivery Provider with whom the restaurant otherwise has a relationship. The Delivery Provider sends the order to the restaurant, and charges the restaurant its typical substantial fee, just as if the order originated from the Delivery Provider's own website or mobile application (when it did not). But, as mentioned previously, Google never obtained permission from the restaurant to sell the restaurant's products and services, or to use the restaurant's tradename within its website. Google's conduct damages the restaurant, because, among other reasons, had the restaurant received the order directly, it would have avoided the Delivery Provider's fees altogether.

9.     In yet another scenario—when Google does not have a Delivery Provider willing to accept orders captured from its illicit storefront—Google's software causes its "Order Online" button to link into another deceptive webpage owned and controlled by Google. This second webpage includes links to competing Delivery Providers—such as Doordash, Grubhub, and Postmates—all of whom likewise attempt to capture the consumer and order within their proprietary platforms. But, like the storefront, Google deliberately misbrands the webpage so that the user forms the mistaken belief that the webpage and services are sponsored and approved by the restaurant, when nothing could be further from the truth. The restaurant never approved of Google's website, nor agreed to sponsor any of the Delivery Providers in a dedicated webpage branded as the restaurant. The Delivery Providers, after all, are the restaurant's competitors.

10.     In either case, Google's motive is simple: insert itself into a significant stream of commerce irrespective of Plaintiffs' and class members' proprietary rights, and then leverage its position to advance its current and future business objectives. For example, and as further described herein, Google presently uses its illicit food ordering platform to force user adoption of its nascent e-wallet service, known as Google Pay—which is the only means of payment within Google's storefront. But, like everyone else, Google cannot directly copy and use the restaurant-class members' hard-earned tradenames and use them in commerce without the restaurants' approval, much less to suggest

3

associations and sponsorships that do not exist; nor can it engage in false advertising by misrepresenting the nature and characteristics of its own commercial activities and those of its advertisers.

11.     Google's use of Plaintiffs' and class members' tradenames in connection with its deceptive button and webpages violates Sections 1114 and 1125(a) of the Lanham Act—two sections of the code that make it illegal for third parties, like Google, to use in commerce exact copies, counterfeits, or replicas, of registered, and unregistered, tradenames without the consent of the tradename owner, where such use is likely to cause confusion, mistake, or deception. *See* 15 U.S.C § 1114 (directed to registrants); and § 1125(a)(1)(A) and (B) (not limited to registrants).

12.     On behalf of a nationwide class of restaurants subjected to Google's deceptive practices and misappropriation of their goodwill and tradenames in connection with Google's button and webpages, Plaintiffs bring this action to enjoin Google and to seek redress for Google's deceptive and unlawful conduct.

## II.     **PARTIES**

13.     Plaintiff Left Field Holdings LLC is a Florida limited liability company which operates a Lime Fresh franchise at a restaurant located at 9005 SW 72nd Place, Miami, Fl, 33156 ("Lime Fresh Dadeland"). Lime Fresh Dadeland opened in 2010. Lime Fresh Dadeland operates under the tradenames: Lime Fresh, and Lime Fresh Mexican Grill.

14.     Plaintiff Left Field Holdings II LLC is a Florida limited liability company which operates a Lime Fresh franchise at a restaurant located at 12516 SW 88th Street, Miami, Fl, 33186 ("Lime Fresh West Kendall"). Lime Fresh West Kendall opened in 2012. Lime Fresh West Kendall operates under the tradenames: Lime Fresh, and Lime Fresh Mexican Grill.

15.     Plaintiff Left Field Holdings III LLC is a Florida limited liability company which operates a Lime Fresh franchise at a restaurant located at 8484 NW 36th Street, Miami, Fl, 33166 ("Lime Fresh Doral"). Lime Fresh Doral opened in 2014. Lime Fresh Doral operates under the tradenames: Lime Fresh, and Lime Fresh Mexican Grill.

16.     Plaintiff Left Field Holdings IV LLC is a Florida limited liability company which operates a Lime Fresh franchise at a restaurant located at 3275 NE 1st Avenue, Miami, Fl, 33137 ("Lime

Fresh Midtown"). Lime Fresh Midtown opened in 2018. Lime Fresh Midtown operates under the tradenames: Lime Fresh, and Lime Fresh Mexican Grill.

17.     Plaintiff Left Field Holdings V LLC is a Florida limited liability company which operates a Lime Fresh franchise at a restaurant located at 12000 Biscayne Blvd, Miami, Fl, 33181 ("Lime Fresh North Miami"). Lime Fresh North Miami opened in 2020. Lime Fresh North Miami operates under the tradenames: Lime Fresh, and Lime Fresh Mexican Grill.

18.     Plaintiff Left Field Holdings VI LLC is a Florida limited liability company which operates a Lime Fresh franchise at a restaurant located at 1439 Alton Road, Miami Beach, Fl, 33139 ("Lime Fresh South Beach"). Lime Fresh South Beach opened in 2018. Lime Fresh South Beach operates under the tradenames: Lime Fresh, and Lime Fresh Mexican Grill.

19.     Plaintiff Everfresh Endeavors is a Florida limited liability company which operates as the franchisor or licensor to the Left Field Holding entities identified above, with its principal place of business located at 4316 Clearbrook Lane, Kensington, MD 20895 ("Everfresh").

20.     Plaintiffs Lime Fresh Dadeland, Lime Fresh West Kendall, Lime Fresh Doral, Lime Fresh Midtown, Lime Fresh North Miami, Lime Fresh South Beach, and Everfresh, shall be collectively referred to herein as Plaintiffs or *Lime Fresh*.

21.     Defendant Google LLC ("Google") is a Delaware limited liability corporation with its principal place of business in Mountain View, California. Its parent, Alphabet Inc., was number 9 on the 2021 U.S. fortune 500, with 2021 revenues of over $357 billion and net income of over $76 billion.

### III.     JURISDICTION AND VENUE

22.     This Court has federal subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338, as the action arises under the Lanham Act, 15 U.S.C. §§ 1051, *et seq*. This Court has general jurisdiction over the defendant because it has systematic and continuous contact with this District and because its corporate principal place of business is within this District.

23.     The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; in the aggregate, there are more than 100 members in the proposed class; and at least one class member is a citizen of a state different from the defendant.

AMENDED COMPLAINT                                                    CASE NO. 3:22-cv-01462

24.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the defendant resides in this district, and because the wrongful conduct giving rise to this case occurred in and/or emanated from this District. This case is a class action involving intellectual property rights and hence is subject to district-wide assignment pursuant to N.D. Cal. General Order No. 44.

### IV.     FACTUAL ALLEGATIONS

#### A.     Plaintiffs, the Class and Delivery Providers.

25.     Plaintiffs and class members make up one of the largest industries in the nation.[1] The class is comprised of restaurants located throughout the United States, all of whom have had their goodwill and tradenames misappropriated by Google as described herein. Upon information and belief, Plaintiffs and class members number in the tens of thousands. The identity of all such restaurants is known to Google and will be determined through discovery.

26.     Plaintiffs Left Field Holdings I-VI are a collection of "fast casual" restaurants operating in Florida under the "Lime Fresh Mexican Grill" tradename. Although each Left Field Holdings entity is a different physical restaurant and a separate legal entity, all are under common ownership and management. In their most recent fiscal year, Plaintiffs, Left Field Holdings I-VI, collectively generated over $11 million in revenue.

27.     Plaintiff Everfresh is the franchisor or licensor to Left Field Holdings franchisees. Everfresh is the registered and rightful owner of the trademark: "Lime Fresh Mexican Grill," under U.S. Reg. No. 3,054,007; attached hereto as Exhibit C.

28.     Plaintiffs and class members offer their food products for on-premises dining, take-out, and/or delivery. Generally, takeout and delivery orders may be placed on a restaurant's website and/or mobile application, but they may also be placed by phone, text, or in-person.

29.     In addition to these conventional sources of delivery and take-out orders, many Plaintiffs and class members signed agreements with various authorized Delivery Providers.

---

[1]     Restaurants account for nearly 11 million jobs in the U.S. and 4% of GDP. *See* Charles Lew, *As Restaurants Go, So Goes The Economy,* (Apr. 20, 2020) https://www.forbes.com/sites/forbesbusinesscouncil/2020/04/20/as-restaurants-go-so-goes-the-economy/?sh=177c298c40cc (last visited Jun. 30, 2021).

AMENDED COMPLAINT                                              CASE NO. 3:22-cv-01462

30.    Delivery Providers typically provide two interrelated services: First, they offer proprietary, independently branded websites and mobile applications (collectively, "platforms") that allow consumers to place delivery and take-out orders with restaurants made available within their platforms. Second, the Delivery Providers offer scheduling and mapping technologies (usually within a proprietary app) to connect and route delivery drivers to consumers requesting delivery services for orders placed within the Delivery Providers' websites and apps.

31.    In addition to the above-mentioned platforms and technologies, Delivery Providers often provide contracting restaurants additional tools and services so that the Delivery Provider may efficiently communicate orders received from their platforms in real-time to contracting restaurants. These additional tools and services are usually made available to contracting restaurants via a designated tablet or web interface.

32.    Before making a restaurant available within their platforms, most Delivery Providers first approach the restaurant to obtain their approval; and upon doing so, enter into a form merchant agreement with the restaurant. But not all Delivery Providers do so. Some Delivery Providers are known to include restaurants within their platforms without first approaching the restaurants for their approval. This activity has been the subject of several lawsuits, as well as state legislative changes.[2]

33.    A restaurant's motivation to partner with a Delivery Provider is almost never to make a profit on orders received from the Delivery Provider—Delivery Providers' fees are simply too high, often exceeding 25% of the price of an order. Rather, a restaurant's usual goal is to capture new customers that may later place orders with the restaurant outside of the Delivery Providers' expensive platforms. But, as this complaint alleges, Google's illicit button and webpages prevent these more profitable orders from materializing.

---

[2]    *See Lynn Scott, LLC v. Grubhub Inc.*, No. 1:20-cv-06334 (N.D. Ill. Mar. 22, 2021); *see also City of Chicago v. DoorDash, Inc. and Caviar, LLC*, No. 2021CH04328 (Cir. Ct. Cook Cty. Ill. Aug. 27, 2021); *City of Chicago v. Grubhub Holdings, Inc. and Grubhub Inc*., No. 2021CH04327 (Cir. Ct. Cook Cty. Ill. Aug. 27, 2021); *see also* Cal. Bus. & Prof. Code § 22599 (eff. Jan. 1, 2021) (prohibiting a food delivery platform from arranging for the delivery of an order from a food facility without first obtaining an agreement with the food facility).

7

34.     Delivery Providers are expensive. For example, the Delivery Provider Postmates (now owned by Uber Eats) charges contracting restaurants between 6%-30% of each order.[3] These fees are substantial relative to the typical profit margin within the restaurant industry. Accordingly, Plaintiffs and class members make little (if any) profit on orders received from authorized Delivery Providers.

35.     To avoid these fees, Plaintiffs and class members vastly prefer to capture orders directly through their own order-taking websites and apps, over the phone, or in-person. By doing so, Plaintiffs and class members do not incur the 6-30% fee typically charged by the Delivery Providers.

36.     Capturing an order via a restaurant's website or app not only saves the restaurant money (because the restaurant avoids the Delivery Providers' fees), but also often fosters better customer relationships. Through their own custom websites and apps, restaurants may offer customer loyalty rewards and promotional programs—programs that drive increased customer engagement, and higher revenues and profits for the restaurants. Orders placed directly with restaurants also allow restaurants to maintain more control over the entire customer experience from order through delivery/pickup, ensuring a more seamless, accountable, and enjoyable consumer experience.

37.     Consumers too prefer to order directly with restaurants whenever possible. Numerous consumer surveys demonstrate that when faced with an option, consumers prefer placing orders directly with a restaurant, rather than through third-party apps and websites (such as those offered by Delivery Providers).[4]

38.     Plaintiffs, like many class members, maintain a branded order-taking website at www.limefresh.com, where consumers can place delivery and take-out orders directly with Lime Fresh restaurants. All orders placed by consumers on the Lime Fresh website are routed to the specific Lime Fresh restaurant selected by the consumer upon check-out, and all revenues received for each order flow to the designated restaurant. For take-out orders, the customer picks-up the order directly from the restaurant, and the ordering process is costless to the restaurant. For orders requiring delivery, Plaintiffs

---

[3]     *See* 5/18/2022 Uber agreement attached as Exhibit B.
[4]     *See, e.g.*, poppinpay, https://poppinpay.com/10-staggering-statistics-about-mobile-order-ahead-for-restaurants/ (last visited Jun. 30, 2022); statista, https://www.statista.com/statistics/1170545/us-consumers-direct-vs-third-party-food-delivery-online-orders-coronavirus/ (last visited Jun. 30, 2022).

AMENDED COMPLAINT                                              CASE NO. 3:22-cv-01462

entered into an agreement with a delivery service (DoorDash) on a fixed-fee basis at a fraction of the net-cost of the typical fee charged by Delivery Providers for the same order.[5]

39.     To increase brand awareness and encourage consumer demand, Plaintiffs and class members engage in advertising and marketing. In 2020, quick-service restaurants alone spent an estimated $4 billion on advertising.[6] These advertising expenditures contribute to the reputations and goodwill of Plaintiffs and class members—which is captured by their tradenames.

40.     While consumers will remember a restaurant's tradename, products, and services, they rarely remember a restaurant's phone number, address, or website URL. For that information, consumers today typically turn to an internet search engine; and that search engine is usually Google.

41.     However, beginning in 2019, when a consumer searched for a particular restaurant using Google's search engine and/or mapping interface, Google began intentionally misdirecting the consumer away from the restaurant's own website, physical address, and phone number, and into one of two different websites owned and controlled by Google. These websites are deceptively branded as being offered, sponsored, or approved by Plaintiffs and class members, when, they are not. Additionally, the method Google employs to induce consumers to enter into its websites is also deceptive and unfair. The particulars of Google's illegal and deceptive conduct are described in detail in the following sections.

**B.     Google's illegal use of Plaintiffs' and the class's tradenames.**

42.     Google is the world's largest search engine. It maintains a whopping 90% market-share globally of all internet searches.[7] Within the United States, Google's market-share is only slightly less, maintaining an 87% share of all searches, including an 80% share of searches conducted on desktops,

---

[5]     For each delivery order from Lime Fresh's website, Plaintiffs pay their designated delivery service (*i.e.* DoorDash) a net fee of approximately $2 per order, versus $4-6 per order as charged by the typical Delivery Provider (20-30% of a typical $20.00 order is $4-6 per delivery order). For each take-out order, no fee is charged to Plaintiffs from the Lime Fresh's website; versus a fee of $1.20-4 for similar orders processed by the typical Delivery Providers (6-20% fee of a typical $20.00 order is $1.20-4 per take-out order).

[6]     *Going Mobile: QSR Ad Spend To Grow By $134 Million in 2020*, Inside Radio (Jan. 28, 2020), http://www.insideradio.com/free/going-mobile-qsr-ad-spend-to-grow-by-134-million-in-2020/article_a86f1146-3c22-11ea-85c6-7b3ddbe1f6a4.html (last visited Jun. 30, 2022).

[7]     StatCounter,     https://gs.statcounter.com/search-engine-market-share/mobile/united-states-of-america#monthly-200901-202111 (last visited Jun. 30, 2022)

9

and a 94% share of searches conducted on mobile devices. Put simply, Google dominates the search engine market; and, thus, when someone wants to look up the phone number or website of a restaurant to order food, a Google search is virtually inevitable.

43.      At www.google.com, a user can enter a search term or phrase into a text field.



*Figure 1: Google's Search Engine and Search Text Field. (Captured approximately 1/10/2021)*

44.      Upon a user submitting a search term or phrase, Google uses proprietary technology to search an index of websites available on the world-wide-web for relevant and responsive results before presenting the results to the user in what is often referred to as a "search engine results page" (herein referred to as the "SERP").

45.      The SERP is a webpage designed, developed, and hosted by Google. Depending on the search term or phrase entered by the user, Google may present different SERP configurations to the searching-user. Typically, however, the SERP is comprised of two sections, with a third section displayed once Google determines the user is searching for a particular business. The first section is a list of "natural," non-paid, responsive search results. This list is generated by Google's proprietary "search algorithm," and is typically presented to the user on the left-hand side of the user's browser window.

46.      The second section is a list of paid advertisements responsive to the user's search term or phrase, generated by yet another one of Google's proprietary algorithms. This algorithm takes

AMENDED COMPLAINT                                             CASE NO. 3:22-cv-01462

account of the amounts competing businesses "bid" to have their business and website featured as an advertisement just above the "natural," non-paid, search results for the particular search term or phrase (a/k/a, a "keyword"). To minimize consumer confusion, Google's usual practice is to identify each advertisement placed within this section as an "Ad."

47.     The third section, referred to herein as a "Business Information Box," is a section that only appears under certain conditions—when Google determines that the user is searching for a



*Figure 2: Exemplar of SERP showing "Ads," Natural Search Results, and Business Information Box. (Captured approximately 1/10/2021)*

particular business. This section appears on the right-hand side of the user's screen. Within the Business Information Box, Google displays information particular to the business that Google determines the user is likely searching for, including: the business' tradename, address, hours of operation, phone number, and links to the business' website, and directions.

48.     At issue in this complaint is a change Google recently implemented (in 2019) with respect to the SERP and the Business Information Box that Google presents to users following a user's search for a specific restaurant. For purposes of this complaint, the Business Information Box pertinent to the restaurant industry is referred to herein as the "Restaurant Information Box."

49.     Specifically, beginning in 2019, when a user searched for a restaurant, Google began

AMENDED COMPLAINT                                        CASE NO. 3:22-cv-01462

presenting the consumer with a Restaurant Information Box that not only included information particular to the restaurant the user was then searching for, but also a large blue button entitled "Order Online," that Google placed just below the restaurant's tradename.[8]



*Figure 3: Google's SERP and Restaurant Information Box (Captured approximately 9/4/2020)*

50.     When the same search is performed on a mobile device (or a smaller screen), the "Restaurant Information Box" is presented to the user in-line with the search results, rather than on the right-hand-side of the users' browser window. Exhibit A provides an exemplar of the mobile experience. As reflected therein, the features of the mobile experience are substantially similar to the desktop experience highlighted in the screenshots shown throughout the complaint.

51.     The Restaurant Information Box was invented, designed, and developed by Google and is hosted by Google.

52.     The Restaurant Information Box is consistent in design, components, and features, as alleged herein, for each restaurant within the class.

---

[8]     Upon information and belief, Google presents the Restaurant Information Box in response to other user queries. For example, if a user searches for "nearby restaurants" within Google's search engine (at https://www.google.com) or mapping service (at https://www.google.com/maps), the results page will show a list of nearby restaurants along with a map displaying the location of each restaurant within a designated geographic area along with a list of the restaurants within the map on the left-hand side of the screen. When users click on a particular restaurant location within the map, or upon a particular restaurant within the list, they are presented with the Restaurant Information Box (or a slight variation thereof). Plaintiffs will ascertain all available means Google employs to direct users to the Restaurant Information Box, and/or its illicit Storefront and Landing Page when conducting discovery.

AMENDED COMPLAINT                                    CASE NO. 3:22-cv-01462

53.     The Restaurant Information Box presents consumers with information pertinent to the restaurant Google identifies as matching the searched term or phrase entered by the consumer within Google's search field.

54.     Along with other information, the Restaurant Information Box prominently displays images of the restaurant; the restaurant's tradename, address, hours of operation, and phone number; as well a series of buttons (or links) that allow the consumer to: "Call" the restaurant, obtain "Directions" to the restaurant, or access the restaurant's "Website."

55.     As mentioned previously, beginning in 2019, Google began placing a large blue button entitled: "Order Online" within the Restaurant Information Box, directly underneath the restaurant's tradename. Google has also labeled its deceptively placed button, "Order Delivery," and/or "Order Pickup." Plaintiffs will ascertain the various buttons used by Google to direct users into its deceptively branded websites upon discovery.



*Figure 4: Google's Restaurant Information Box (Captured approximately 11/9/2021)*

56.     The "Order Online" button within the Restaurant Information Box was invented, designed, and developed by Google and is hosted by Google.

57.     Google placed the "Order Online" button within the Restaurant Information Box for each Plaintiff and class member without their consent.

AMENDED COMPLAINT                                                    CASE NO. 3:22-cv-01462

58.     Google purposefully placed the "Order Online" button just below the restaurant's tradename to lead consumers to believe the button was sponsored, or approved, by the restaurant, when it is not; and to induce a greater number of clicks.

59.     Google also purposefully designed the "Order Online" button to be larger, brighter, and more visible than other buttons or links with the Restaurant Information Box, including the buttons entitled "Website," "Directions," and "Call" (all of which directly connect the consumer to the restaurant), so that consumers would also believe the button to be sponsored, or approved, by the restaurant, when it is not; and to induce a greater number of clicks.

60.     In fact, consumers are likely to (and do) believe that the "Order Online" button is sponsored, or approved, by the restaurant whose tradename (and other identifying indicia) is displayed within the Restaurant Information Box.

61.     Upon information and belief, since its release, the "Order Online" button has garnered more clicks than any other button or link within the Restaurant Information Box, or more generally within the broader SERP.

62.     Google does not disclose to the searching consumer that the "Order Online" button is not sponsored, or approved, by the restaurant whose tradename is prominently featured just above the button.

63.     When a consumer clicks the "Order Online" button in the Restaurant Information Box, the consumer is directed to one of two different webpages, depending on different preconditions. These webpages are described in the following sections and are referred to, respectively, as "Google's Online Storefront" and "Google's Landing Page."

64.     Significantly, Google deliberately designed these webpages to also be confusing, prominently labeling each of the webpages with Plaintiffs' and class members' tradenames without their approval, in violation of Section 43(a) of the Lanham Act. These violations are in addition to the initial interest confusion caused by Google's deceptive "Order Online" button (described above).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.    Scenario 1: Google's Online Storefront.**

65.    The first webpage, referred to herein as "Google's Online Storefront" (or "Storefront"), is a virtual storefront, whereby consumers can place orders for the restaurant's food items, all under the restaurant's tradename. But Google never obtained the restaurant's consent to set-up the Storefront, or to use the restaurant's tradename.



*Figure 5: Google's Online Storefront landing page Component Parts (Captured approximately 9/4/2020)*

66.    The Storefront, like the Restaurant Information Box, is substantially similar in design, componentry, and features, for all Plaintiffs and class members.

67.    The Storefront was invented, designed, and developed by Google and is hosted by Google.

68.    The Storefront prominently displays the restaurant's tradename at the top of the website, above the restaurant's address, and menu.

69.    Within Google's Storefront, a consumer can electronically select and add food items from the restaurant's menu to a virtual shopping cart. *See* Figure 7, below.

70.    Once a consumer has finished adding items to his virtual shopping cart, the consumer can electronically "check-out" of the Storefront by entering and submitting payment information.

AMENDED COMPLAINT                                                    CASE NO. 3:22-cv-01462

*Screenshots of Google's Storefront*



*Figure 6: Google's Storefront Prominently Displays Tradename of Restaurant (Captured approximately 9/4/2020)*



*Figure 7: Google's Storefront Add Menu Item Process (Captured approximately 9/4/2020)*

16



*Figure 8: Google's Storefront Check-out Process (Captured approximately 9/4/2020)*

71.     To process orders captured from its unauthorized Storefront, and unbeknownst to the restaurant, Google contracts with one or more Delivery Providers with whom the restaurant has an existing contractual relationship.[9]

72.     Upon receiving a customer order within the Storefront, Google sends the order to the Delivery Provider with whom it has contracted (and if Google has contracted with multiple Delivery Providers for a particular restaurant, then to the Delivery Provider selected by the user). The receiving Delivery Provider then: (i) routes the order to the restaurant just as if the order originated from the receiving Delivery Provider's proprietary platforms; and (ii) charges the restaurant the same exorbitant

---

[9]     Google may also route orders from its illicit Storefront to Delivery Providers that have no contractual relationship with the restaurant. To whom, and under what conditions, Google routes its illicit orders will be determined upon discovery. Regardless of these conditions, in each case, Google never had a license to use the Restaurant's tradenames, or permission to sell its menu items.

AMENDED COMPLAINT                                                CASE NO. 3:22-cv-01462

fees for the order (typically in the range of 6-30% of the total price of each order), all without the restaurant having any idea that the order originated from Google's illicit Storefront.

73.   Google never obtained authorization or permission from Plaintiffs and class members to capture orders for Plaintiffs' and class members' food products under their tradenames.

74.   Google never obtained authorization or permission from Plaintiffs and class members to hold itself out to the public as Plaintiffs' and class members' businesses.

75.   Google is not an authorized franchisee or distributor of the Plaintiffs' and class members' restaurants.

76.   Just as Google may not open and operate physical storefronts under the Plaintiffs' and class members' tradenames selling their products without their approval, it may not open and operate virtual storefronts doing the same thing.

77.   Google purposefully designed the Storefront, with Plaintiffs' and class members' tradenames prominently featured at the top of the website, to lead consumers to believe the Storefront is authorized, sponsored, or approved, by the restaurant, even though it is not.

78.   In fact, consumers are likely to (and do) believe the Storefront is authorized, sponsored, or approved, by the restaurant whose tradename is displayed atop the webpage—and particularly when viewed in combination with the preceding confusingly placed "Order Online" button.

79.   Google's Storefront competes for the same consumers as do Plaintiffs' and class members' businesses.

80.   Google's Storefront sells Plaintiffs' and class members' own menu items.

81.   Google's Storefront prominently displays the exact same tradenames as Plaintiffs' and class members' tradenames.

82.   Like the "Order Online" button within the Restaurant Information Box, nowhere within the Storefront does Google advise consumers that it is not authorized by the restaurant whose tradename it prominently displays.

83.   Worse, Google knew that its Storefront was likely to cause consumer confusion, and yet it nevertheless released it to the public despite this knowledge.

84.     By Google's own admission (and as further alleged in paragraphs 85-88), Google intentionally designed the Storefront, in the first instance, to appear to consumers to be "built by the restaurant."

85.     Upon information and belief, Google originally planned to market the Storefront directly to restaurants (rather than to competing Delivery Providers) using a website at https://the.ordering.app.

86.     At https://the.ordering.app, Google touted the benefits and features of its Storefront and invited restaurants to contact Google to become users of the service-offering. Upon information and belief, Google's efforts to market the service-offering directly to restaurants failed; and so Google "pivoted" and decided to market the Storefront to Delivery Providers instead.

87.     Google apparently did not care that the Delivery Providers were not authorized, under their agreements with the restaurants, to set up websites under the restaurants' tradenames outside of their proprietary platforms, much less authorized to pass that right onto third parties, like Google. Once Google decided to contract with Delivery Providers rather than with the restaurants directly, Google had no reason to market its Storefront directly to the restaurants and so it removed its website at https://the.ordering.app from the internet in its entirety (sometime in late 2021).

88.     Critically, however, Google acknowledged within the website at https://the.ordering.app that it designed the Storefront to appear to consumers to be built by the restaurant whose name was featured at the top of the website. Thus, Google knew that its illegal Storefront, if released to the public,

19

1  would likely cause consumer confusion.

2



3

4

5

6

7

8

9

10

11

12

13  *Figure 9: Google's Website Advertising Storefront Capabilities to Restaurants at https://the.ordering.app (Captured approximately 5/11/2021)*

14  89.     Google's own advertising practices further confirm that Google knew its "Order Online"

15  button and linked webpages were likely to cause consumer confusion. As mentioned previously,

16  Google's usual practice is to label advertisements placed within its SERP as advertisements (by placing

17  an "Ad" label besides each advertisement). *See*, e.g., Figure 2, above. But its "Order Online" button is

18  not given such label.

19  90.     Google's prior litigation history likewise confirms that it knows its button and

20  unapproved webpages are illegal and inappropriate.  In 2018, but a year before launching the platform

21  at issue in this complaint, Google sued Kydia, Inc., d/b/a Beyond Menu, for engaging in much the same

22  conduct Plaintiffs now allege against Google.  *See Google LLC v. Kydia Inc. D/B/A Beyond Menu*, Case

23  No 5:18-cv-03047 (N.D. Cal., May 2018).  Within its suit, Google alleged Beyond Menu devised a

24  "scheme" to "seize" control of restaurants' Information Boxes for the purpose of inserting a link to

25  Beyond Menu's ordering website, so that consumers searching for the restaurant would be diverted

26  away from the restaurants' "official" website and into a Beyond Menu's website, thereby increasing

27

28

AMENDED COMPLAINT                                              CASE NO. 3:22-cv-01462

Beyond Menu's fees and commissions.  Upon information and belief, Google settled its lawsuit against Beyond Menu shortly after it launched the platform at issue herein.

91.     Google's precise business justification for its Storefront is unknown. However, minimally, Google derives significant value and benefit from unauthorized Storefront, by forcing all consumers ordering food within the platform to register and pay for the items using Google Pay (herein referred to as "GPay").

92.     GPay is a digital wallet (or e-wallet) platform and online payment system developed by Google to power in-app, online, and in-person contactless purchases on mobile devices.

93.     GPay competes with Apple Pay and Samsung Pay. At the time Google launched the Storefront, GPay's user-base substantially lagged-behind the user-base of Apple's comparable Apple Pay service. Upon information and belief, Google's illicit Storefront provided Google with a means to reach (and potentially covert) millions of restaurant customers into new GPay users.

94.     Plaintiffs will ascertain the precise number of new GPay users obtained by Google due to its illicit Storefront, as well as the value Google assigns to such users, through discovery.

95.     Upon information and belief, Google likely derives other value and benefit from its Storefront, including by: (1) driving increased user engagement of its search engine (and related advertising business); (2) using information obtained from its Storefront to inform its immensely profitable advertising business; and/or (3) capturing value (or consideration) from Delivery Providers with whom it originally "partnered" when launching the service. [10]

96.     The precise value and benefit captured by Google from its unauthorized button and Storefront will be determined through discovery.

97.     Google's unauthorized use of Plaintiffs' and class members' tradenames has proximately caused Plaintiffs and class members damages.

98.     Had Google not illegally diverted consumers into its Storefront, a substantial portion of consumers searching for Plaintiffs' and class members' restaurants would have placed orders directly with the restaurants (either in-person, over the phone, or through the restaurants' own order-taking

---

[10]     *See*, e.g., https://postmates.com/blog/google-it-then-postmate-it-order-via-google-search-maps-google-assistant/ (last visited, Jun. 28, 2022), wherein Postmates claims within a blog posting that it "partnered" with Google.

AMENDED COMPLAINT                                              CASE NO. 3:22-cv-01462

1  websites or apps). In that event, Plaintiffs and class members would have avoided the fees charged by

2  the Delivery Providers to whom Google routed its illicit orders.

3    99.    From January 2020 through August 2020, in connection with Plaintiffs' six restaurants,

4  Google intercepted over 1,000 delivery and take-out orders from customers with its unauthorized and

5  deceptive button and Storefront, many of whom would have otherwise ordered from Plaintiffs'

6  restaurants directly. Of those orders, approximately nine out of ten orders were take-out orders, while

7  one out of ten were delivery orders.

8    100.    Upon information and belief, since launching its unauthorized Storefront, Google has

9  hijacked millions of customers and orders from Plaintiffs and class members.

10    101.    Google's unauthorized and deceptive use of Plaintiffs' and class members' tradenames

11  has also caused Plaintiffs and class members additional irreparable harm by: (a) damaging and diluting

12  their respective reputations, goodwill, and tradenames by associating Plaintiffs and class members with

13  an ordering website that by all appearances is offered by the restaurant, but that the restaurant does not

14  own or control; and (b) by depriving Plaintiffs and class members of the value of direct customer

15  relationships that would have produced an indeterminate amount of business, revenue, and profits for

16  the restaurants in the years to come.

17    **D.    Scenario 2: Google's Landing Page.**

18    102.    As previously mentioned, there is another webpage that Google displays following a

19  user clicking on the "Order Online" button, depending on a different set of preconditions than those

20  mentioned previously. This second webpage, referred to herein as "Google's Landing Page," presents

21  itself to the user when, upon information and belief, Google does not have a Delivery Provider signed-

22  up to receive and process orders from its unauthorized Storefront. But just like the Storefront, this page

23  too makes unauthorized and deceptive use of Plaintiffs' and class members' tradenames.

24

25

26

27

28

AMENDED COMPLAINT                                                    CASE NO. 3:22-cv-01462

1

2

3

4

5

6

7

8

9



Figure 10: Google's Landing webpage (Captured approximately 11/2/2021)

10      103.    The Google Landing Page is substantially similar in design, componentry, and features

11  for all Plaintiffs and class members.

12      104.    The Landing Page, like the Storefront, was invented, designed, and developed by Google

13  and is hosted by Google.

14      105.    The Landing Page prominently displays the same tradename, address, and images of the

15  restaurant whose tradename was atop the preceding Restaurant Information Box.

16      106.    On the Landing Page, just below the restaurant's tradename and address, Google lists a

17  series of Delivery Providers.

18      107.    Within the Landing Page, users may click on any one or more of the listed Delivery

19  Providers; and upon doing so, the user is directed (or linked) to the Delivery Provider's website.

20      108.    Google never obtained Plaintiffs' and class members' consent to create and display such

21  a Landing Page, or to use Plaintiffs' or class members' tradenames within the webpage.

22      109.    Google does not disclose to consumers that the Landing Page is presented without the

23  authorization or approval of Plaintiffs and class members.

24      110.    Google's Landing Page and preceding "Order Online" button, are likely to, and in fact

25  do create consumer confusion because:

26          a.   They give the user the impression that the restaurant authorized, sponsored,

27              and approved of Google's button and Landing Page, when, in fact, the

28              restaurant never provided Google (or anyone else) with such approval;

23

AMENDED COMPLAINT                                                    CASE NO. 3:22-cv-01462

b.   They give the user the impression that the restaurant sponsors, stands behind, or controls, each of the Delivery Providers' services that are identified directly below its tradename, when the restaurant does not; and

c.   They give the user the impression that the restaurant accepts orders from each Delivery Provider within the Landing Page, when in fact the restaurant may have no relationship whatsoever with some of the Delivery Providers listed within Google's unauthorized Landing Page. For example, Plaintiffs do not have a relationship with Caviar, a company identified at the top of Google's list.



*Figure 11: Google Landing Page displays Caviar with whom Lime Fresh has no relationship (Captured approximately 11/2/2021)*

111.    Just as Google derives value and benefit from its illicit Storefront, so too does Google generate value and benefit from its unauthorized Landing Page. Among other benefits, Google's Landing Page provides an inducement for consumers to continue to return to its illegal Storefront in the future; and more generally, for consumers to return to Google's immensely profitable search engine and advertising business. Upon information and belief, Google also uses the information generated from its Landing Page to inform its advertising business. The precise value and benefit obtained by Google due to its Landing Page will be ascertained upon discovery.

112.    Plaintiffs and class members are harmed by Google's unauthorized and deceptively branded Landing Page because, among other reasons, the screen serves to: (i) divert consumers searching for Plaintiffs' and class members' restaurants into competing businesses, depriving the

AMENDED COMPLAINT                                         CASE NO. 3:22-cv-01462

restaurants of direct customer relationships; (ii) impose higher costs and fees on the restaurants than what the restaurants would otherwise experience had they obtained orders directly in person, over the phone, or via the restaurants' own order-taking websites; and (iii) dilute and damage Plaintiffs' and class members' brands, reputations, and tradenames by associating Plaintiffs and class members with third party websites and Delivery Providers over whom they do not exert control.

**E.     Google is Not Licensed to Use Plaintiffs' and Class Members' Tradenames.**

113.    Google is not licensed by Plaintiffs and class members to use Plaintiffs' and class members' tradenames in connection with Google's unauthorized and deceptively branded button and webpages.

114.    Google never sought, nor obtained, Plaintiffs' and class members' consent to use their tradenames in connection with Google's button and webpages.

115.    Rather, at least with respect to its Storefront, Google claims (wrongly) to have a right to use Plaintiffs' and class members' tradenames because of a purported transfer or delegation of such a right by and through its relationship with Delivery Providers to whom it passes its illicit orders.[11]

116.    But the Delivery Providers are not authorized to create websites branded as the restaurant outside of the Delivery Providers proprietary platforms; and they do not have rights, in all events, that can be extended to third parties, such as Google.

117.    By way of example, Postmates is a Delivery Provider with whom Google contracted to process at least some of the orders captured by Google's illegal Storefront.

118.    Upon information and belief, all (or nearly all) of Postmates' restaurants are subjected to Google's illegal Storefront, amounting to tens of thousands of U.S.-based restaurants.

---

[11]    *See* Google Business Profile Help, https://support.google.com/business/answer/10918858?visit_id=637774458410193900-1275963472&hl=en&rd=1 (last visited Jun. 30, 2022), wherein Google describes its button and Storefront as follows: "You can accept orders through third-party providers *who state they have authorized relationships with your business*. These providers can automatically update and make food ordering available." (emphasis added). *See also* Sean Captain, *Local food delivery companies say Google devastated their business,* Fast Company (Aug. 10, 2021), http://www.fastcompany.com/90658514/google-restaurant-listings-local-delivery-services (last visited on Jun. 30, 2022), wherein the author claims, "[A] delivery company can add itself to the ordering links in a restaurant's business listing. But Google's program essentially runs on the honor system. A Google representative acknowledges that abuses were rampant in the past."

AMENDED COMPLAINT                                    CASE NO. 3:22-cv-01462

119.    Postmates reportedly controls 8-10% of the Delivery Provider market within the United States,[12] operates within approximately 3,000 U.S. cities (as of the beginning of 2019),[13] and has annual revenues reportedly approaching $1 billion (as of 2018).[14] Postmates claims to have relationships with over 600,000 restaurants and businesses.[15]

120.    Postmates executes a form agreement with its client restaurants, which is updated from time to time.[16] While the agreement purports to authorize *Postmates'* use of its merchant-restaurant's tradenames within *Postmates'* proprietary mobile app and website, the agreement does not authorize *Google's* use of the restaurant's tradenames within *Google's* webpages. Moreover, the agreement does not authorize Postmates to license third parties, such as Google, to sell the restaurant's products and services or to prominently brand websites as the restaurant. Indeed, Postmates' agreement plainly states the license grant is "limited," "non-transferable" and that the "[a]greement may not be…delegated or subcontracted, in whole or part." *See* Exhibit B, §§ 7 and 19. Thus, Google's conduct is not authorized by and through its relationship to Postmates.

121.    At some point after launching its illegal storefront, Google recognized that the Delivery Providers may not, in fact, have rights to extend to Google, and so it developed and released an "opt-out" feature, available to restaurants within its "My Business" service (n/k/a "Google Business Profile"). But the availability of an opt-out feature does not save Google from its wrongful conduct as complained of herein. First, the opt-out feature only removes the restaurant from the Google's illicit Storefront, not Google's confusingly branded Landing Page. Second, with respect to the Plaintiffs and class members subjected to Google's Storefront, the feature is not available to restaurants that are not

---

[12]    Janine Perri, *Which company is winning the restaurant food delivery war?* Bloomberg Second Measure (Feb. 15, 2022), https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/ (last visited Jun. 30, 2022).

[13]    Wikipedia, https://en.wikipedia.org/wiki/Postmates (last visited Jun. 30, 2022).

[14]    *Id*.

[15]    Apple App Store Preview, https://apps.apple.com/us/app/postmates-food-delivery/id512393983 (last visited Feb. 28, 2022).

[16]    Postmates was recently acquired by Uber, so its merchant terms of use is now controlled by "Uber Eats U.S. Merchant Terms and Conditions," attached as Exhibit B (dated 5/18/22), and located at: Uber, https://www.uber.com/legal/en/document/?uclick_id=fb04753b-5626-48ed-b7a1-f0a633b5aef3&_ga=2.116279046.1608366540.1643736442-27952752.1641239834&_gac=1.140627462.1643736442.EAIaIQobChMIzdLss4Pf9QIVMQV9Ch1lsARhEAAYASAAEgLFj_D_BwE&country=united-states&lang=en&name=uber-eats-merchant-terms-and-conditions (last visited Jun. 30, 2022).

26

also users of Google's "My Business" service. Third, Google cannot convert the silence or inaction of a restaurant/My Business user into assent merely by prescribing the conditions of rejection. Google—like everyone else—must obtain the consent of the tradename owner *prior* to its intended use.

122.    Upon information and belief, Plaintiffs' and class members' agreements with other Delivery Providers likewise do not authorize Google to use Plaintiffs' and class members' tradenames in connection with its button, Storefront, or Landing Page. A complete list of Delivery Providers with whom Google has contracted in connection with its Storefront and Landing Page will be ascertained through discovery.[17]

## V.    CLASS ALLEGATIONS

123.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek to pursue their claims on behalf of a class of similarly situated persons. The parameters of the class may be refined through discovery and will be subject to Court approval and modification, but for the purposes of this complaint, Plaintiffs propose the following class definitions:

    a.   All persons or entities in the United States who own or operate restaurants or businesses in the food service or restaurant industry as to which Google placed an "Order Delivery," "Order Pickup," or "Order Online" button under the restaurant's or business's tradename on Google's search results page or Google's maps page, and captured customer orders through Google's Storefront under the restaurant's or business's tradename.

    b.   All such persons or entities identified in subpart (a) (above) and whose names are registered with the Principal Register, as maintained by the United States Patent and Trademark Office.

    c.   All persons or entities in the United States who own or operate restaurants or businesses in the food service or restaurant industry as to which Google placed an "Order Delivery," "Order Pickup," or "Order Online" button under the restaurant's or business's tradename on Google's search results page or Google's maps page, and presented users with Google's Landing Page.

    d.   All such persons or entities identified in subpart (c) (above) and whose names are registered with the Principal Register, as maintained by the United States Patent and Trademark Office.

---

[17]    Significantly, upon information and belief, at least three of the largest Delivery Providers operating within the United States – DoorDash, Grubhub, and Uber Eats (separate and apart from its recently acquired subsidiary, Postmates) – do not participate in Google's Storefront (Scenario One), and have never processed orders originating from the Storefront. Upon information and belief, these Delivery Providers refuse to participate in Google's Storefront because they recognize it uses Plaintiffs' and class members' tradenames illegally.

AMENDED COMPLAINT                      CASE NO. 3:22-cv-01462

124.     Plaintiffs further propose that the following persons be excluded from any certified class: (i) Google, its current or former officers, directors, management, employees, subsidiaries, and affiliates; and (ii) all judicial officers and associated court staff assigned to this and their immediate family members.

125.     Plaintiffs reserve the right to amend the class definition if further investigation, discovery, or both indicate that such definitions should be narrowed, expanded, or otherwise modified.

126.     The proposed class meets the requirements for class certification pursuant to Federal Rule 23(a) and (b).

127.     *Numerosity*: The members of the class are so numerous that joinder of all members is impracticable. The precise number of restaurants subject to Google's unauthorized button, and webpages as alleged herein are unknown at this time, but it is believed to be in the tens of thousands. Upon information and belief, Google has subjected most (and perhaps every) restaurant that has a relationship with the Delivery Provider Postmates, to its unauthorized button and Storefront. Postmates alone has relationships with hundreds of thousands of restaurants within the United States. Additionally, upon information and belief, Google has subjected nearly every restaurant in the country to its unauthorized button and Landing Page, amounting to many hundreds of thousands of class members.

128.     *Commonality*: Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members. Such common issues include:

   a.   Whether Google's actions as alleged herein constitute infringement under 15 U.S.C. § 1114, and in particular, use of a counterfeit mark, for those class members that have registered marks on the Principal Register;

   b.   Whether Google's actions as alleged herein constitute false association, false advertising, or unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) for all class members, whether or not their names are registered on the Principal Register;

   c.   Whether Google's use of the Plaintiffs' and class members' tradenames in connection with its unauthorized button and webpages is likely to cause consumer confusion or deceive as required under the statute;

d.  Whether the Plaintiffs and class members are entitled to declaratory and/or injunctive relief to rectify the alleged violations of law; and, if so, what is the appropriate nature of the equitable and injunctive relief to which the Plaintiffs and class members may be entitled;

e.  Whether Google's conduct caused the Plaintiffs' and class members' damage; and if so, the extent of such damage;

f.  Whether Google derived profit from its conduct; and if so how much profit it derived; and

g.  The appropriate measure of monetary relief to be awarded Plaintiffs and class members under 15 U.S.C. § 1117(a), (b), and (c) including specifically in relation to: Google's profits, Plaintiffs' and class members' actual damages, enhancements and treble damages relating to the foregoing, and costs and attorneys' fees. Additionally, to the extent Plaintiffs elect statutory damages for use of counterfeit marks in connection with those class members with names registered on the Principal Register, the amount of damages that the court considers just within the statutorily prescribed range.

h.  Whether or not, Plaintiffs and members are entitled to injunctive relief under 15 U.S.C. § 1116.

129.  *Typicality*: Plaintiffs' claims are typical of the claims of other members of the class in that Plaintiffs and the members of the class sustained damages arising out of Google's uniform (and programmatic) deceptive conduct and use of Plaintiffs' and class members' tradenames and goodwill without authorization.

130.  *Adequacy*: Plaintiffs will fairly and adequately represent and protect the interests of the class, and have retained counsel competent and experienced in complex litigation, trademark disputes, and class actions. Plaintiffs have no interest antagonistic to those of the class, and Google has no defenses unique to Plaintiffs.

131.  *Predominance*: The common questions identified above are likely to predominate at trial when compared to any individualized issues that may arise. Moreover, the major issue upon which

Google's liability will depend—in particular, whether Google's use of Plaintiffs' and class members' tradenames in connection with Google's unauthorized and deceptive button, and webpages is likely to cause consumer confusion and/or deception—is susceptible to generalized proof since the alleged conduct across the class is consistent and programmatic.

132.    *Policies Generally Applicable to the Class*: This class action is appropriate for certification because Google has acted or refused to act on grounds generally applicable to the class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the class, and making final injunctive relief appropriate with respect to the class as a whole. Google's practices challenged herein apply to and affect the members of the class uniformly, and Plaintiffs' challenges of those practices hinges on Google's conduct with respect to the class as a whole, not on facts or law applicable only to Plaintiffs.

133.    *Superiority*: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and because joinder of all parties is impracticable. The damages suffered by the individual members of the class will likely be relatively small, especially given the burden and expense of the individual prosecution of the complex litigation necessitated by Google's actions. Thus, it would be virtually impossible for the individual members of the class to obtain effective relief from Google's misconduct. Even if members of the class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

## VI.    CLAIM FOR RELIEF

### Trademark Infringement and Counterfeiting

134.    Plaintiffs incorporate the allegations above as if set forth fully herein.

135.    Google's conduct violates 15 U.S.C. § 1114, which provides, in relevant part, "any person who shall, without the consent of the registrant-- (a) use[s] in commerce any reproduction,

counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with such use is likely to cause confusion, or to cause mistake, or to deceive…shall be liable in civil action by the registrant for the remedies hereinafter provided." 15 U.S.C. § 1114. The code further defines a "counterfeit" mark as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.

136.    Many class members hold registrations within the Principal Register, giving constructive notice to Google of these class members' ownership rights to their tradenames.

137.    The class members with registered marks use them to promote their own restaurants, products and related food ordering capabilities, including in many cases their own food ordering websites and telephone numbers.

138.    Defendant intentionally and knowingly copied the registered marks of class members and used the same in connection with its button and competing, unauthorized, webpages for the purpose of selling unauthorized, unlicensed, product and services to consumers.

139.    Defendant did not and failed to obtain the consent of the class members with registered marks to use their names in connection with its unauthorized button and webpages.

140.    As a direct and proximate result of Google's direct copying and use of the class members' registered tradenames, class members suffered pecuniary injury.

141.    As a direct and proximate result of Google's direct copying and use of the class members' registered tradenames, Google profited.

142.    Under 15 U.S.C. § 1117(a), class members with registered marks are entitled to Google's profits, actual damages, costs of the suit, and attorneys' fees.

143.    Under 15 U.S.C. § 1117(b), class members with registered marks are entitled to treble damages.

144.    Under 15 U.S.C § 1117(c), class members with registered marks are entitled statutory damages, at their option, of not less than $1,000 or more than $200,000 per class member, as the court considers just; or if the court finds that the use of the counterfeit mark was willful, up to $2,000,000 per class member.

145.    Under 15 U.S.C. § 1116, Plaintiffs and class members also seek injunctive relief prohibiting Google from using Plaintiffs' and class members' tradenames in connection with its unauthorized and deceptive "Order Online" button, Storefront, and Landing Page as described herein, and requiring Google to take appropriate affirmative steps to undo and prevent consumer confusion.

**<u>Violations of Lanham Act – Section 43(a)</u>**

146.    Plaintiffs incorporate the allegations above as if set forth fully herein.

147.    Google's conduct violates Section 43(a) of the Lanham Act, which prohibits the use "in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." Additionally, the act permits such an action to be maintained by "any person who believes that he or she is or is likely to be damaged…" 15 U.S.C. § 1125(a)(1).

148.    Google's unauthorized and deceptive use of Plaintiffs' and class members' tradenames, as described herein, and specifically in relation to Google's unauthorized and deceptive button and webpages are uses in commerce in connection with offered goods, services, and commercial activities.

149.    Google's unauthorized and deceptive use of Plaintiffs' and class members' tradenames, as alleged herein, are likely to, and in fact do, cause consumer confusion, including by causing consumers to believe that: (i) Google's button; (ii) Google's webpages; and (iii) the goods, services and commercial activities offered within the websites are all affiliated, connected, associated, sponsored or approved by Plaintiffs and class members, when they are not. Additionally, Google's unauthorized and deceptive use of Plaintiffs' and class members' tradenames, as alleged herein, is also a false representation, made in an advertisement and promotion, concerning the nature, characteristics, and qualities of: (i) Google's button; (ii) Google's webpages; and (iii) the goods, services, and commercial activities made available within the websites.

150.     Internet users searching for Plaintiffs' or class members' tradenames, and who are thereafter presented with Google's "Order Online" button under the Plaintiffs' and class members' tradenames; and whereupon clicking the button are presented with the Online Storefront and/or Landing Page, under Plaintiffs' and class members' tradenames, have a reasonable expectation that such button, websites, and the goods, services, and commercial activities offered within those websites are all affiliated, connected, associated, sponsored or approved by the Plaintiffs and/or class members.

151.     The button, websites, and the goods, services, and commercial activities offered within the websites are in fact not affiliated, connected, associated, sponsored or approved by Plaintiffs and class members.

152.     As a direct and proximate result of Google's unauthorized and deceptive use of Plaintiffs' and class members' tradenames, Plaintiffs and class members have suffered pecuniary injury.

153.     As a direct and proximate result of Google's unauthorized and deceptive use of Plaintiffs' and class members' tradenames, Google has profited.

154.     Under 15 U.S.C. § 1117(a), Plaintiffs and class members are entitled to disgorgement of Google's profits, actual damages, costs of the suit, and attorneys' fees.

155.     Under 15 U.S.C. § 1117(a), Plaintiffs and class members are entitled to enhanced damages, up to three times actual damages, because, among other reasons, Google's conduct was deliberate and willful.

156.     Under 15 U.S.C. § 1116, Plaintiffs and class members also seek injunctive relief prohibiting Google from using Plaintiffs' and class members' tradenames in connection with its unauthorized and deceptive "Order Online" button, Storefront, and Landing Page as described herein, and requiring Google to take appropriate affirmative steps to undo and prevent consumer confusion.

## VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the class members, respectfully request that this Court enter judgment as follows:

    a.  The Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    b.  For class members with registered marks:

AMENDED COMPLAINT                                                                    CASE NO. 3:22-cv-01462

1          i.  An award of monetary relief according to the proof, including Plaintiffs' and

2             class members' damages and Google's profits, trebled due to Defendant's

3             use of a counterfeit mark; or alternatively (and assuming Plaintiffs so elect),

4             statutory damages in an amount determined to be just and within the range

5             prescribed by statute between $1,000 and $200,000, and up to $2,000,000 (if

6             willful) per class member;

7      c.  For class members with unregistered marks:

8          i.   An award of monetary relief according to the proof, including Plaintiffs' and

9             class members' damages and Google's profits, enhanced as appropriate up to

10            three times actual damages;

11     d.  Injunctive and equitable relief;

12     e.  Pre- and post-judgment interest, as provided by law;

13     f.  Attorneys' fees and costs, including expert fees and costs; and

14     g.  Any such further relief as the Court may deem just and proper.

## VIII.   **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the class members, pursuant to Rule 38 of the Federal Rules of Civil Procedure, request a trial by jury on all claims so triable by right.

Dated: June 30, 2022

*/s/ Bruce J. Wecker*
Bruce J. Wecker (Cal. Bar No. 78530)
Bonny E. Sweeney (Cal. Bar No. 176174)
bsweeney@hausfeld.com
Michael P. Lehmann (Cal. Bar No. 77152)
mlehmann@hausfeld.com
bwecker@hausfeld.com
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
(415) 633-1908

Joseph M. Vanek (*pro hac vice granted*)
Bruce S. Sperling (*pro hac vice granted*)
Eamon Kelly (*pro hac vice granted*)
Tim Sperling (*pro hac vice granted*)
Treavor K. Sheetz (*pro hac vice granted*)
**SPERLING & SLATER, P.C.**
55 West Monroe Street
Suite 3200
Chicago, IL 60603
(312) 641-3200
jvanek@sperling-law.com
bss@sperling-law.com
ekelly@sperling-law.com
tsperling@sperling-law.com

Jason A. Zweig (*pro hac vice granted*)
Seth Meyer (*pro hac vice granted*)
Alex Dravillas (*pro hac vice granted*)
**KELLER LENKNER LLC**
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 216.8667
jaz@kellerlenkner.com
sam@kellerlenkner.com
ajd@kellerlenkner.com

Bonny E. Sweeney (Cal. Bar No. 176174)
bsweeney@hausfeld.com
Michael P. Lehmann (Cal. Bar No. 77152)

AMENDED COMPLAINT                                         CASE NO. 3:22-cv-01462

mlehmann@hausfeld.com
Bruce J. Wecker (Cal. Bar No. 78530)
bwecker@hausfeld.com
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
(415) 633-1908

Irving Scher (*pro hac vice granted*)
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
(646) 357-1100
ischer@hausfeld.com

AMENDED COMPLAINT                                CASE NO. 3:22-cv-01462